**In re SILICON VALLEY TELECOM EXCHANGE, LLC, Debtor.**

**No. 01–55137–ASW.**

United States Bankruptcy Court,
N.D. California.

June 13, 2002.

Scott L. Goodsell, Campeau, Goodsell and Diemer, San Jose, CA, for Debtor.

Robert S. Gebhard, Office of the U.S. Trustee, San Jose, CA, for U.S. Trustee.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTION FOR RELIEF FROM AUTOMATIC STAY BY ENRON BROADBAND SYSTEMS, INC.

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is a motion by Enron Broadband Systems, Inc. ("EBS"), which is opposed by the Debtor in Possession in this Chapter 11 case, Silicon Valley Telecom Exchange, LLC ("Debtor").

EBS' motion originally included a request for relief from the automatic stay of § 362(a) to terminate provision of electric service to Debtor, but that request was withdrawn during trial. The motion now seeks relief from the automatic stay to permit recoupment or setoff of amounts owed by EBS against amounts owed by Debtor.

EBS is represented by Jon L.R. Dalberg, Esq. of Andrews & Kurth, L.L.P., and Debtor is represented by Marc L. Pinckney, Esq. of Campeau Goodsell Diemer, L.C. The matter has been tried and submitted for decision. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### I.

### FACTS

Debtor filed a Chapter 11 petition in this Court on October 22, 2001. EBS filed a Chapter 11 petition in the Bankruptcy Court for the Southern District of New York on December 2, 2001.

Debtor leases a building in San Jose from its owner and subleases parts of it to subtenants. In May 1999, EBS entered into a sublease with Debtor for approximately 20,758 square feet of space, with rent of approximately $44,487 per month. At its own expense, EBS installed the kind of equipment needed to operate EBS' business at the building, including a 200–ampere circuit breaker ("Breaker"). Pacific Gas & Electric ("PG & E") supplies the building with electric power, which flows through a single meter (billed by PG & E to Debtor) into a power distribution frame and then to a series of breakers for the various premises in the building. Under the sublease, Debtor is required to provide electric power for the building's common areas and "life safety" features (e.g., exit lights, parking lot lights, etc.), and EBS is required to reimburse Debtor for the amount that Debtor pays to PG & E for the power that flows through the meter to EBS' premises.

In June or July of 2000, an oral agreement was made, providing that Debtor could draw power from EBS' Breaker and pay EBS for use of the Breaker. Debtor's Chief Executive Officer, Fernando Don Rubio II ("Rubio"), testified that he asked EBS' Manager of Wholesale Services, Mark P. Santikos ("Santikos"), for such an arrangement—Santikos testified that he received the initial request on behalf of Debtor from "somebody" that he believed worked for Cupertino Electric (a contractor that had performed services for both Debtor and EBS). Regardless of who asked Santikos, he agreed, and Debtor paid Cupertino Electric approximately $83,000 to connect Debtor to EBS' Breaker.

Debtor began receiving power from EBS' Breaker in August 2000. Debtor used some of that power for the building's common areas and life safety features, and

provided some of it to Debtor's affiliate, Silicon Valley Telecom And Internet Exchange ("SVTIX"), which supplies telecommunication connections to its customers in the basement of the building. Santikos testified that he understood that the power Debtor drew from the Breaker would be used only for the building's common areas and life safety features—Rubio testified that he told EBS "from the beginning" that the power would also be used for SVTIX' business operations in the basement.

EBS has alleged that Debtor had to obtain power from EBS because PG & E would not supply enough due to Debtor's poor credit rating, but EBS offered no evidence in support of that and Rubio denied it. Rubio testified that his general policy was to do business with his own customers, such as EBS. He explained that Debtor had previously been connected to a breaker owned by another tenant—the other tenant wanted to end that arrangement, so Rubio asked EBS for the use of EBS' Breaker. Rubio said that he wanted to receive power from EBS' Breaker instead of PG & E for several reasons: his policy of dealing with his customers when possible; EBS was a tenant in the business of supplying power, and "the star of the show" that was "going to do it better and bigger"; and EBS had a back-up generator that was not available from PG & E. The use of such a generator was "critical" to protect SVTIX and its customers against power losses and Rubio believed that it would cost $150,000 to install one (which Debtor would have to do if it purchased power from PG & E), whereas it would cost only $83,000 to connect to EBS' Breaker and thereby receive the use of EBS' generator.

It is undisputed that, when the oral agreement was made for Debtor to receive power from EBS' Breaker in exchange for payment, the price was not discussed, and no express agreement was ever made about price. Rubio testified that he assumed EBS would charge Debtor for the amount of power that Debtor used, because that was how PG & E charged Debtor, and that was what Debtor did when "passing through" to tenants the charges by PG & E for the power that PG & E supplied to the building. Further, Cupertino Electric installed a submeter when connecting Debtor to the Breaker, which Rubio believed was for the purpose of measuring Debtor's usage. Rubio testified that Santikos instructed him to have the connection work performed by Cupertino Electric, but Santikos denied that and also denied that Cupertino Electric was authorized to act as EBS' agent. Santikos testified that Cupertino Electric had done work for EBS in the past, but he did not believe that there was ever a "regular retainer" arrangement—he characterized the firm as the contractor approved by Debtor to do work on the building, and Rubio acknowledged that Cupertino Electric had performed services for Debtor at the building. Santikos testified that he had no knowledge of anyone at EBS discussing installation of a submeter with Cupertino Electric, did not know that a submeter was being installed, and did not become aware of the submeter until some unrecalled point after installation.

EBS did not bill Debtor for use of the Breaker until March 6, 2001. At that time, EBS sent Debtor a letter stating that Debtor owed a flat monthly fee of $11,984 from August 2000, based on the Breaker's capacity. Rubio told Santikos that he was "stunned" to be charged so much and never would have used EBS' Breaker had he realized the charge would be so high—Rubio testified that Santikos told him to meet with EBS' engineer, Douglas Charles Mohr ("Mohr"), and "work it out" with him. Santikos testified

that EBS did make an effort to determine whether a different "pricing structure" could be used, and Mohr was sent to the building to install a submeter, monitor Debtor's actual usage, and make a report. Before Mohr's report was received, EBS filed Chapter 11 and Mohr's employment was terminated.

Mohr testified that he prepared a report after making two visits to the building and left it in his computer at EBS. His recommendation was that Debtor should be charged for actual usage rather than on the basis of the Breaker's capacity. He testified that the local market was a "volatile" one and the usage rates established by PG & E as the "incumbent" regulated utility would reflect changes in transmission distribution and seasonal delivery costs, whereas a flat rate based on capacity would not—further, it was not the industry standard to use flat rates for services to consumers such as Debtor, given the diversity of the loads experienced, fluctuating use at different times of day, changing loads, and the effects of operating conditions such as the number of personnel present, weather, etc. Mohr said that flat rate charges assume that power is delivered in very small increments rather than in bulk, and loads that are "flat" rather than cyclical—EBS did not deal with bulk supply and highly cyclical loads so its standard charging methods did not reflect those conditions, yet those were the conditions that applied to Debtor.

Santikos testified that he would not have accepted Mohr's recommendation had he received it, because it did not comply with EBS' policy to charge based on capacity and thereby recover costs. Santikos said that he has negotiated many "co-location contracts" with EBS' customers to use space in EBS' telecommunication facilities and receive power there (primarily DC power, some AC power, some with both

kinds of power)—he has "quoted" hundreds of such contracts, and negotiated and executed "tens" of them—in his experience, there is no customer buying power from EBS that is charged at a rate other than full capacity. Santikos said that EBS' flat rates included the cost of power to EBS, the cost of the "infrastructure" (including the cost of all equipment needed), and the cost of operating the facility—a rate based on usage that covered EBS' costs "probably" would have been accepted, but Mohr's recommendation did not accomplish that. As described by Santikos, Debtor's use of the Breaker permitted Debtor to receive 200 amperes of AC power that was "backed up", and involved Debtor's use of EBS' infrastructure in the form of the generator and any equipment required to deliver the power; he acknowledged that Debtor did not use equipment associated with DC power. Mohr testified that the infrastructure typically provided by EBS would include an uninterruptible power supply ("UPS"), which was not furnished by EBS' generator for the Breaker—accordingly, the quality of the power drawn by Debtor from the Breaker was "much lower" than the quality that EBS normally supplied to other customers in exchange for payment of a flat rate.

Mohr calculated what he considered to be a reasonable rate to charge Debtor based on actual usage. He said that a monthly charge should reflect actual consumption, plus a "demand charge" consisting of "make ready" costs or operating costs to maintain the distribution system, plus the cost of installing, operating, and maintaining the back-up generator. He noted that, in this case, Debtor had paid the make ready costs—those are traditionally passed on to the customer when the owner has absorbed them, but there were no such costs to EBS here—there was a system and infrastructure already in place that had excess capacity, so the question

was how to determine the value of that excess. Mohr described the excess as a "stranded asset", and noted that EBS was selling a 200 ampere breaker with the connected load and generator, which was something EBS already had but was not using, and which it cost EBS nothing to hold. Mohr testified that he found the submeter to be accurate, and calculated Debtor's consumption charge based on 121,088 kilowatt hours used according to the meter readings, from the time Debtor was connected to the Breaker through March 15, 2002. He used 15′ per kilowatt hour as a reasonable rate, based on PG & E's average charge of 13.1′ for the last four months of 2001. He calculated a monthly charge for availability of the backup generator at $162.72—that figure assumed that the generator would cost $3.25 per month to run and maintain based on PG & E's history of average "outages" and "downtime" for the area, and assumed that $159.47 was needed to recover the cost of the generator over a 24 month period.

Mohr noted that his calculations did not specifically provide for a profit, though EBS would receive a profit because one was encompassed in the 15′ rate per kilowatt hour—since PG & E was charging only 13.1′, that was all that Debtor was passing through to EBS for EBS' use of power; if EBS were to charge Debtor 15′ per kilowatt hour for the power that Debtor received through the Breaker, EBS would collect an extra 1.9′ per kilowatt hour. Mohr stated that his calculations did not reflect savings that EBS experienced by receiving power from PG & E through Debtor, such as not having to pay approximately $116,000 to install EBS' own meter, and a monthly savings from a discounted rate that PG & E charged Debtor for "bundled" services provided in large quantities. Mohr said that a 10%–15% overhead and profit is normal and assumes that no savings are associated

with the overhead so that, if EBS' savings were considered here, there should be a "passthrough" with no additional profit (i.e., the savings in expenses would be equivalent to a profit). Mohr testified that he considered Debtor's use of EBS' Breaker to be an "accommodation" by EBS, rather than EBS' sale of a marketable product, such as selling raw bulk AC power to another service provider—permitting Debtor to use the Breaker was not a burden to EBS because EBS had excess capacity in the Breaker and the make ready charges usually associated with provision of service (which normally have to be recovered through a "profit scenario") had not been incurred by EBS in this case. Mohr estimated that EBS had spent approximately $22,000,000 on improvements at the building, plus another $500,000 to buy the back-up generator and another $500,000 to install it.

Both Santikos and Mohr testified that they were not authorized to make any binding commitments on behalf of EBS, and that any agreements they made would be subject to final approval by others; Rubio said that he realized final approval was needed and he never heard that it was received. Rubio testified that Mohr told him after visiting the building that Mohr would recommend that EBS charge Debtor some $250 per month based on usage— Rubio assumed that was what would be done, since Santikos told him to "work things out" with Mohr, and he thought that Mohr was "high up" in EBS.

Santikos testified that, at some point in 2001, EBS considered terminating Debtor's use of the Breaker. He said that he had to discuss "some issues" with Rubio and the power would be shut off if he was not able to do talk to Rubio, but he did not think that he ever told anyone to "go down and shut the power off". Derrick Joseph Wise ("Wise") testified that he is a Field

Engineer for EBS and was told by Santikos in August or September 2001 to "go in and turn off the power" because Santikos had been unable to contact Rubio. Wise explained to Santikos that Debtor could not be disconnected from the Breaker without eliminating power to the building's common areas, and Santikos then withdrew his instruction. Wise testified that he had been present during one or two conferences at EBS about what Debtor should be charged and he believed that EBS wanted to "maximize" the price. He also had the impression that Santikos and Rubio were not "bosom buddies" and that there was "some animosity" between them—he thought that EBS was "very hostile" toward Debtor, and "eager to have things done with Rubio".

It is undisputed that EBS is in default under its sublease with Debtor, and EBS' attorney stated at trial that the defaults are as set forth in a declaration of Rubio dated March 18, 2002 (Debtor's Exhibit 1). Those total $241,473.75 through March 1, 2002, consisting of rent for December 2001 through March 2002, the annual management fee for 2001, and common area maintenance charges and electric power reimbursements for October 2001 through January 2002. The lease provides, inter alia, that, if the landlord defaults under the lease, the tenant is entitled to cure the default upon written notice to the landlord and deduct the cost of cure from rent up to 25% of the monthly rent amount. EBS' time to assume the lease under § 365 was extended in EBS' Chapter 11 case until March 29, 2002, and the lease has now been rejected by operation of law due to EBS' failure to assume by that date. EBS' attorney announced at trial that, due to rejection of its lease, EBS will remove its equipment from the building, including the Breaker.

## II.

## ANALYSIS

### A. Debtor's Debt To EBS

The parties agree that Debtor owes EBS some amount for Debtor's use of EBS' Breaker, and they agree that their oral contract for such use does not fix the price or a basis upon which the price should be calculated. Rubio assumed that the price would be based upon usage, and Santikos assumed that the price would be based upon capacity, but neither claims to have expressed his assumption to the other until some seven months after Debtor's use began, and neither claims to have been misled by the other into making a false assumption.

 Since there is no contract price, nor any express or implied agreement about the basis for the price, it necessarily follows that the appropriate price must be an objectively determined market price, see, e.g., *In re Thompson,* 788 F.2d 560, 563 (9th Cir.1986):

> When a lease is ultimately rejected but its interim continuance was an actual and necessary cost and expense of the estate, the allowable administrative expense is valued not according to the terms of the lease [citation omitted], but under an objective worth standard that measures the fair and reasonable value of the lease. [Citations omitted] The rent reserved in the lease is presumptive evidence of fair and reasonable value [citation omitted], but the presumption may be rebutted by demonstrating that the reasonable worth of the lease differs from the contract rate [citations omitted]. [ ] The actual value or benefit conferred on the debtor is not the object of the reasonable worth inquiry. [Citation omitted]. Rather, the fair and reasonable value of the lease upon the open

market must control. [Citations omitted]

■ The question here is "which market"? Santikos has significant experience with EBS' sale of power under co-location agreements with customers who use space in EBS' facilities—he said that such power is primarily DC rather than AC, and Mohr testified without contradiction that it is typically supplied in very small increments rather than in bulk, for flat, rather than cyclical, loads. According to Santikos, all of EBS' co-location customers pay flat rates based on capacity rather than for actual usage, and it is EBS' policy to include in such flat rates amounts required to recover various costs, including the cost of power, the cost of the infrastructure and equipment, and the facility operation costs. But Debtor is not in the same position as EBS' co-location customers. As Mohr explained, EBS already had the Breaker and generator when Debtor connected, and it was Debtor that paid the costs of connection to that existing system—EBS had paid to acquire that equipment, but the Breaker was not being used and it cost EBS nothing to have it there (i.e., a fixed cost or a "stranded asset"). Debtor also differed from the typical co-location customer because Debtor received AC power without making use of EBS' equipment for DC power, and the power was supplied in bulk for cyclical loads. Further, Debtor was receiving a lesser quality of power than that supplied to EBS' co-location customers, due to the lack of a UPS system for Debtor.

It is apparent that the market composed of EBS' co-location customers is not the same as the market represented by Debtor, and that EBS had no established practice for dealing with situations such as that involving Debtor's use of the Breaker. Mohr was an experienced and knowledgeable witness, and his explanation of the differences between the two sets of users and the reasons for charging one a flat rate based on capacity versus charging the other a rate based on actual usage was very well supported and persuasive. The Court agrees with Mohr that Debtor's use of EBS' Breaker was more in the nature of an accommodation by EBS than it was in the nature of EBS' sale of a marketable product—EBS' traditional basis for setting sale prices does not apply to the different transaction of providing a service in exchange for a fee that covers EBS' direct costs to provide the service.

Mohr's analysis of what Debtor should pay based on usage was sound. With respect to whether the charge to Debtor should include a profit component, EBS did not dispute Mohr's conclusion that a normal profit of 10% to 15% is fully offset by EBS' savings through receiving the benefit of a discounted rate charged by PG & E to Debtor (and passed through to EBS by Debtor), and through using Debtor's meter rather than installing EBS' own meter. Further, some profit is built in if EBS charges Debtor 15′ per kilowatt hour as Mohr suggested, since Debtor passed through to EBS only the actual amount charged by PG & E, and that averaged 13.1′ per kilowatt hour during the last four months of 2001. Insofar as the generator expense is concerned, Mohr calculated alternative monthly charges depending on whether the cost of the generator was based on an industry standard of $400 per kilowatt hour or his estimated actual cost of $666.67 per kilowatt hour—Mohr preferred the former because his estimate of actual cost was based only on his observation of conditions at the building and had not been confirmed by evidence such as invoices. EBS argued that there should be no need to resort to an industry standard when an installed generator already exists and actual cost is capable of being determined. EBS' point is well taken, al-

though the fact is that evidence of the actual cost has not been presented and that figure therefore cannot be determined for purposes of this trial. However, the Court has found Mohr's opinion reliable on other points, and there is no apparent reason not to rely on his estimate of cost based on his observations at the building and his experience of such matters, despite the lack of invoices proving the actual cost of acquiring and installing the generator. Accordingly, the Court will accept Mohr's calculation that is based on estimated cost rather than on industry standard, which is a charge of $269.08 per month to cover the cost of acquiring, installing, and operating the generator.

### B. Recoupment

■■■ EBS argues that it should be entitled to recoup all amounts that Debtor owes to EBS for use of the Breaker against all amounts that EBS owes to Debtor under the sublease. EBS cites the controlling authority on the doctrine of recoupment, *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir.1996) ("*Newbery*"), which explains the difference between recoupment and setoff:

> "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" [Citation omitted] The defining characteristic of setoff is that "the mutual debt and claim ... are generally those arising from different transactions." [Citation omitted] [Original emphasis]

*Newbery*, at 1398.

> In contrast to setoff, recoupment "is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." [Citation omitted] [Original em-

phasis] Under recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.'" [Citations omitted] For this reason, recoupment has been analogized to both compulsory counterclaims and affirmative defenses.

*Newbery*, at 1399.

■■■ Newbery adopted the "logical relationship" test to determine whether the parties' claims arose from the "same transaction":

> In deciding whether the relevant claims arose from the same transaction, the district court applied the "logical relationship" test outlined by the Supreme Court in *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). In Moore, the Court stated that " '[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relation ship." *Id.*, 270 U.S. at 610, 46 S.Ct. at 371; see also *Albright v. Gates*, 362 F.2d 928, 929 (9th Cir.1966) ("In deciding what is a transaction, we take note that the term gets an increasingly liberal construction.").

*Newbery*, at 1402.

EBS argues that the two claims in this case are logically related as both arising from the parties' sublease: the sublease requires Debtor to provide power for the building's common areas and life safety features, and Debtor sought to meet that obligation by drawing power from EBS' Breaker and thus incurring charges under the parties' oral agreement; the sublease also requires EBS to pay rent to Debtor; the sublease therefore is the source of each party's obligation to the other.

Debtor argues that its debt to EBS for use of the Breaker arises under the oral

agreement, which is a completely separate transaction from the landlord/tenant transaction that is represented by the parties' sublease. Debtor points out that the power Debtor receives from the Breaker is not used solely to meet Debtor's obligations under the sublease for the building's common areas and life safety features, but also to serve the business operated in the basement by SVTIX, which is not a party to the sublease between Debtor and EBS.

As Newbery notes, the logical relationship test is a flexible one. The test is not defeated in this case simply by the fact that the sublease creating EBS' obligation to pay rent and the oral agreement creating Debtor's obligation to pay for use of the Breaker are two separate contracts—the two obligations still might be logically related to each other despite having originated from separate contracts, if, for example, the oral agreement was made for the purpose of permitting Debtor to meet Debtor's obligations under the sublease. EBS argues that such a connection does exist between the sublease and the oral agreement, because Debtor could not provide power for the building's common areas and life safety features as required by the sublease unless Debtor received power under the oral agreement. However, the fact is that Debtor's use of the Breaker under the oral agreement is not limited to receiving power for the purpose of meeting Debtor's duties under the sublease—Debtor also uses that power for SVTIX. Wise testified, without contradiction, that it was not possible to disconnect Debtor from the Breaker and still maintain power to the common areas, so the practical reality is that Debtor's use of the Breaker cannot be divided between the use that is necessary to enable Debtor to perform under the sublease and the use that is not necessary for that purpose. EBS' claim for Debtor's use of the Break-er cannot be wholly attributed to Debtor's performance under the sublease because part of the power Debtor receives from the Breaker is being applied to SVTIX—since it is not possible to divide the Breaker's provision of power into two parts, EBS' charge for use of the Breaker cannot be allocated between parts that do not exist. Accordingly, the logical relationship test fails because Debtor's duty to pay under the oral agreement is a duty to pay for power that Debtor is using for multiple purposes, only one of which is the purpose of enabling Debtor to perform under the sublease; the other purpose is to supply SVTIX with power for its services to its own customers, which is wholly unrelated to the sublease.

## C. Setoff

Setoff of "mutual" debts is permitted by § 553 and, as explained by Newbery, above, the debts need not arise from the same transaction. The term "mutual" means that pre-petition debts cannot be set off against post-petition debts. By its terms, § 553 applies only to pre-petition debts, but that does not mean that mutual post-petition debts cannot also be set off against each other, see 5 King, Collier on Bankruptcy (15th ed. rev.2000) § 553.03[6]. Although the common law right of set off is preserved by § 553, relief from the automatic stay must be received in order to exercise that right. EBS seeks stay relief to set off the amount that Debtor owes EBS for use of the Breaker against the amount that EBS owes Debtor under the sublease, both pre-petition and post-petition; Debtor has not opposed set off of debts in either category. EBS is entitled to perform the setoffs requested, with respect to both pre-petition debts and post-petition debts, so long as pre-petition debts are not set off against post-petition debts.

Debtor argues that the sublease permits EBS to set off no more than an amount equivalent to 25% of each month's rent and requires the giving of notice, citing § 19.2, which is part of § 19 entitled "Remedies" and provides as follows:

> Landlord shall be in default of this Lease if Landlord shall breach any covenant under this Lease and such breach continues for thirty (30) days after written notice by Tenant of such breach thereof to Landlord, or, in the case of an interruption of Tenant's provision of services to its customers, such thirty (30) day notice shall not be required, unless Landlord has commenced the cure within said thirty(30) day period and proceeds diligently to completion. In the event of an uncured default by Landlord, Tenant may, upon subsequent written notice to Landlord, cure the default if it involves the Premises and Tenant may offset the cost thereof from Annual Rent, not to exceed twenty-five percent (25%) of the Monthly Installment of Annual Rent in any one (1) month. [Emphasis supplied]

Although the provision uses the term "offset", it is plain from context that what is being discussed is recoupment. As pointed out by Newbery, recoupment involves reducing a party's claim by the amount of an opposing party's claim that arises from the same transaction as does the first party's claim (akin to the second party asserting a defense to the first party's claim)— setoff, on the other hand, involves reducing a party's claim by the amount of an opposing party's claim that arises from a different transaction than does the first party's claim (i.e., "netting out" the two claims, instead of the first party paying 100% to the second party and the second party paying 100% to the first party). The sublease describes a situation where the landlord defaults under the lease, the tenant gives notice that it will cure the default if the landlord does not, the tenant does cure the default at its own expense, and the tenant then deducts the amount of the cure expense from the next month's rent check (to a maximum of 25% of the rent). What the lease describes is the tenant's recoupment, because the tenant's obligation to pay rent arises from the lease and so does the landlord's obligation to pay for the cure of its own defaults. As discussed above, recoupment does not apply to these parties' claims against each other, so this provision of the sublease does not apply to those claims either.

## CONCLUSION

The market value of Debtor's use of EBS' Breaker should be determined on the basis of Debtor's actual power consumption, rather than on the basis of the Breaker's capacity. The appropriate monthly charge to Debtor should be 15′ per kilowatt hour for Debtor's power consumption according to the submeter, plus $269.08 for the availability of the generator. The evidence at trial established totals through March 15, 2002, which figures should be adjusted as necessary to account for the period after that date until Debtor's use of EBS' Breaker ends.

The doctrine of recoupment does not apply to EBS' claim for Debtor's use of the Breaker, and Debtor's claim for rent and other amounts owed by EBS under the sublease, because the two claims are not logically related under the test of Newbery.

EBS is entitled to stay relief to set off its claim for Debtor's use of the Breaker against Debtor's claim for rent and other amounts owed by EBS under the sublease, both pre-petition and post-petition, to the extent that the claims are mutual, i.e., so long as pre-petition claims are not set off against post-petition claims. EBS' right of setoff is not limited by § 19.2 of the sub-

lease, since that paragraph applies to recoupment rather than to setoff. The evidence at trial established EBS' defaults under the sublease through March 1, 2002, which figures should be adjusted as necessary to account for any charges coming due after that date and for any subsequent payments made by EBS.

Counsel for Debtor shall submit a form of order so providing, after review by counsel for EBS as to form.